J-S08007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RAUL ARNOLD NAZARIO RAMIREZ | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JESSICA ALAMO RIVERA | : | No. 1233 MDA 2021 |

Appeal from the Order Entered August 23, 2021
In the Court of Common Pleas of Northumberland County Civil Division at
No(s):  CV-2018-01863

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.:                          **FILED APRIL 27, 2022**

Raul Arnold Nazario Ramirez ("Father") appeals from the August 23, 2021 custody order granting the request of Jessica Alamo Rivera ("Mother") to exercise primary custody of their daughter, J.N.A., and to relocate with J.N.A. from Northumberland County, Pennsylvania, to Puerto Rico.  We affirm.

We begin with a summary of the relevant background.  Mother and Father began their relationship in Puerto Rico where they both were attending college.[1]  N.T., 7/29/21, at 7-8, 158.  They never married.  *Id*. at 8.  Approximately one and one-half years into their relationship, Father moved to

_____

[1] Mother was born in New York, but moved to Puerto Rico when she was eleven years old.  N.T., 7/29/21, at 8.  Her mother and other family members still reside in Puerto Rico.  Father obtained his college education in Puerto Rico and was working as a police officer there when he met Mother.  *Id*. at 139-40.  His parents live in New Jersey, but they also own a home in Puerto Rico, and Father has other family there.  *Id*. at 41, 159.

Pennsylvania to work as a correctional officer at a federal prison. *Id*. at 9, 146. Mother joined Father in Pennsylvania in 2015, bringing along her daughter from a previous relationship. *Id*. at 9. J.N.A. was born in September 2016. *Id*. at 9, 11. After J.N.A.'s birth, she resided with Mother, Father, and her half-sister in a house Father owned in Northumberland County, Pennsylvania. *Id*. at 10, 108.

Mother and Father separated in October 2018.[2] *Id*. at 10-11, 120. Following their separation, Father filed a custody complaint in the Northumberland County Court of Common Pleas on October 18, 2018, wherein he requested that the court award him primary physical custody and shared legal custody of J.N.A.[3] Mother filed a cross-complaint, seeking primary physical custody and shared legal custody of J.N.A. She averred that she was J.N.A.'s primary caregiver and she recently had obtained a temporary order under the Protection from Abuse ("PFA") Act against Father.

On November 17, 2018, the parties agreed to resolve the PFA matter by a one-year civil no-contact order. N.T., 7/29/21, at 13. Around the same time, they resolved their custody dispute through conciliation. By consent

---

[2] Ultimately, Mother moved into a home two blocks away from Father's home. *Id*. at 109-10.

[3] Father also requested emergency relief, alleging that Mother planned to take J.N.A. to Puerto Rico. The court granted Father's emergency relief by entering an order prohibiting Mother from taking J.N.A. outside the continental United States without Father's consent.

order entered on January 2, 2019, and later by another consent order entered on November 18, 2019, Mother and Father agreed to shared legal custody, primary physical custody with Mother, and partial physical custody with Father. Father's custodial periods shifted periodically, but he most recently exercised physical custody every weekend.

The parties were operating under this custody arrangement when Mother filed a petition to modify custody on July 31, 2020, seeking a more specific holiday schedule based upon Father's alleged refusals to share holiday time with her. Mother then filed the August 7, 2020 notice of proposed relocation that is at issue in this appeal. Mother indicated that she wished to relocate with J.N.A. to Florida, Puerto Rico. Father filed a counter-affidavit objecting to the proposed relocation and any modification of the existing custody order.

Following a custody conference, the trial court entered an order on October 14, 2020, prohibiting Mother from relocating with J.N.A. pending further order of Court. The October 14, 2020 order also scheduled a hearing on Mother's relocation request, and set forth a specific holiday schedule and directed the parties to follow it.

After a series of continuances, the court conducted a relocation hearing on July 29, 2021.[4] Mother testified that she wished to relocate because she

---

[4] J.N.A. was almost five years old at the time of the hearing. Neither party requested that she testify.

has an extensive support system in Puerto Rico. N.T., 7/29/21, at 35. She emphasized that she moved to Pennsylvania because Father obtained employment here, but she lacks support now that they are not together. *Id*. at 35, 50, 61, 63. Mother planned to bring J.N.A. and her half-sister to live with her mother ("Maternal Grandmother") in Puerto Rico. *Id*. at 25-27, 35. In addition to Maternal Grandmother, Mother's cousins, aunts, uncles, and friends live in Puerto Rico. *Id*. at 25. Mother has visited Puerto Rico four to five times since moving to Pennsylvania, including once with Father and J.N.A, and two other times with J.N.A. *Id*. at 25-26. Each time they have stayed with Maternal Grandmother. *Id*. at 26. She also noted that Father has cousins, aunts, and uncles in Puerto Rico. *Id*. at 41.

Mother asserted that she has been the primary caretaker for J.N.A. since she was born. *Id*. at 14. She provides full time care to J.N.A. and J.N.A.'s half-sister, age thirteen. *Id*. at 17-23. Mother stressed that her ability to support herself in Pennsylvania without relying on Father was limited. *Id*. at 61-63. She described difficulties securing childcare for J.N.A. without a job and an inability to get a job without childcare. *Id*. at 49. She noted she had no family here to assist her or provide backup care. *Id*. at 61.

Mother did not want to rely on Father because she considered him to be her abuser. *Id*. at 61, 63. According to Mother, she separated from Father because she "felt afraid." *Id*. at 11. She also felt like Father engaged in "economic abuse;" he had "control over everything economically" and would

not give Mother "a say on anything." *Id*. He isolated her from people and she could not talk to the neighbors or have friends. *Id*. She briefly worked as a logistic assistant at a demolition company in 2018. *Id*. at 14, 48. Father took care of J.N.A. while Mother was at work, but he often complained that Mother should be caring for J.N.A. instead of working because she was J.N.A.'s mother and he provided for the family economically. *Id*. at 15-16. Eventually, she had to resign because Father refused to continue taking care of J.N.A. *Id*. at 14.

During her testimony, Mother indicated she planned for the next chapter of their lives in Puerto Rico. She researched schools in Puerto Rico to provide J.N.A. with a similar experience to her education in Pennsylvania, including assistance with speech therapy like she receives now. *Id*. at 30. Mother lined up a job selling life insurance. *Id*. at 36-37. To support her case, Mother presented the testimony of her prospective employer, the principal of the private school to which she wished to send J.N.A., and Maternal Grandmother.

Regarding Father's relationship with J.N.A., Mother suggested that Father could have custody during summers and any other time J.N.A. is off from school. *Id*. at 38. According to Mother, there are abundant direct flights to Puerto Rico out of airports within driving distance, and when she and J.N.A. flew there in May 2021, it cost $180 per person for a round-trip ticket. *Id*. at 39-41.

In Mother's view, it is J.N.A.'s best interest to move with her to Puerto Rico because J.N.A. has lived with Mother and her half-sister since she was born, and Mother has been her primary caretaker and her source of comfort. *Id*. at 42. Mother maintained her need for support was such that she planned to move to Puerto Rico without J.N.A. if the court did not permit J.N.A. to relocate. *Id*. at 63.

For his part, Father presented the testimony of his mother ("Paternal Grandmother"), who testified about her visits with J.N.A. in New Jersey, her visits to Father's home, and her plan to stay regularly with Father to assist in the care of J.N.A.

Father also testified in opposition to Mother's relocation request, stressing that the home he owns in Lewisburg was the same home J.N.A. has lived in since she was born. *Id*. at 109. The home is a three-minute walk away from Mother's house. *Id*. at 110. According to Father, he and Mother moved to Pennsylvania because they had dreams of "a better life, a better future for our kids, a quiet life." *Id*. at 123. They wished to escape the "out of control" crime in Puerto Rico and go somewhere where the job prospects were better. *Id*. at 123, 128. Father also appreciated that they were in driving distance from Paternal Grandmother and his father ("Paternal Grandfather"), brother, uncles, and cousins, all of whom lived in New Jersey or New York. *Id*. at 124. According to Father, his family visited J.N.A. at least once a month. *Id*. at 125-26.

Father testified he was in regular contact with J.N.A.'s teacher at the Head Start program she attends. *Id*. at 111-12. Father testified about the progress J.N.A. has made in the program, and the excellent education he expected her to receive at the local public school when she started kindergarten in the fall as compared to the schools in Puerto Rico. *Id*. at 115.

Father downplayed any notion that he abused Mother or that she was afraid of him, asserting that while the civil no-contact order was in effect, Mother spent time at his house daily and even went on multiple overnight family getaways at hotels with him. *Id*. at 115-19. He contended the reason she did not work was simply because his job required long hours; she took care of J.N.A. and he took care of the bills. *Id*. at 161.

In addition to the custody relocation dispute, the trial court was tasked with deciding a petition for contempt Mother filed just weeks before the hearing. The dispute concerned who would exercise custody over the Independence Day holiday. According to Mother, she reminded Father that the governing custody order provided that she would have custody of J.N.A. during the Independence Day holiday, even though it was a weekend and normally Father's custodial period. *Id*. at 33. However, Father refused to return J.N.A. so the Mother could exercise custody. In fact, he did not drop J.N.A. off until 8 p.m. on Monday, July 5, 2021. *Id*. at 31-34. When asked by Mother's attorney why he kept J.N.A. for Independence Day, Father responded, "Because I believed that it was my time to have [J.N.A.]." *Id*. at

138. He acknowledged the prevailing custody order, but maintained that he had the right to keep J.N.A. in contravention of the agreement because Mother "used to hold too, for the holidays." *Id*.

On August 23, 2021, the trial court filed an order granting Mother's relocation request, modifying the custody arrangement to accommodate the distance between the parties, and granting Mother's petition for contempt. Specifically, during the school year, the court awarded Mother primary physical custody and Father partial physical custody as agreed upon by the parties. The court provided Father with eight consecutive weeks of custody during the summer and alternated the custodial time around Christmas vacation between the parties. It also directed the parties to afford regular reasonable contact through electronic means.

Father timely filed a notice of appeal and a concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court complied with Rule 1925(a), filing its opinion on October 27, 2021.

Father presents the following issues for review:

I.      Whether the trial court erred in failing to set forth, within the time required for taking an appeal, its analysis [of] the 16 custody factors set forth in 23 Pa.C.S.A. § 5323(d) and the 10 relocation factors set forth in 23 Pa.C.S.A. § 5337(h).

II.     Whether the trial court erred in permitting Mother to relocate to Puerto Rico with [J.N.A.] and in granting primary physical custody to Mother.

Father's brief at 5 (unnecessary capitalization omitted).

Upon review of Father's issues, we bear in mind the following standard and scope of review.

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

> *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

> *R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

"[I]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, based on the

evidence presented, given due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion in awarding custody to the prevailing party." ***E.B. v. D.B.***, 209 A.3d 451, 468 (Pa.Super. 2019) (citation and some quotation marks omitted). We have explained,

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***D.Q. v. K.K.***, 241 A.3d 1112, 1117 (Pa.Super. 2020) (quoting ***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa.Super. 2006)).

Child custody actions are governed by the Child Custody Act, 23 Pa.C.S. §§ 5321-5340. The primary concern in any custody case is the best interests of the child. The Custody Act sets forth ten relocation factors and sixteen custody factors that the trial court must consider when addressing whether a proposed relocation and modification of custody serves the best interests of a child. ***See A.M.S. v. M.R.C.***, 70 A.3d 830, 836 (Pa. Super. 2013) ("The trial court must consider all ten relocation factors and all sixteen custody factors when making a decision on relocation that also involves a custody decision.").

As the party proposing relocation, Mother had the burden of proving that relocation will serve J.N.A.'s best interest as set forth under § 5337(h), which provides as follows.

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Additionally, because the relocation decision necessarily impacted the parties' existing custody award, the Custody Act required the trial court to address the following sixteen custody factors.

**5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

- 12 -

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

In his first issue, Father argues that the trial court's one paragraph analysis explaining its decision in its August 23, 2021 order was insufficient to comply with the Custody Act's requirement that the court delineate its reasoning under the statutory factors prior to the time for appeal. Father's Brief at 14-16 (citing 23 Pa.C.S. § 5323(d)). Father claims the analysis fell

short because the court did not relate its observations about the parties' situation to the custody or relocation factors or indicate in whose favor any particular factor weighed. *Id*. He also emphasizes that the analysis did not mention abuse, yet the trial court made and relied upon findings of abuse against Father in its subsequent Rule 1925(a) opinion. *Id*.

Father is correct insofar as the Child Custody Act requires the trial court to "delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). This Court has interpreted § 5323(d) as requiring a trial court to explain its analysis of the custody and relocation factors "at or near the time it issues its decision in a custody proceeding" and in advance of the appeal deadline. *A.M.S.*, *supra* at 835. However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa.Super. 2013).

Although the trial court's Rule 1925(a) opinion explained the court's rationale and offered an analysis of each statutory factor regarding relocation and custody, the court's earlier order, entered on August 23, provided a more condensed analysis of the factors. That rationale provided as follows.

> After this [c]ourt's consideration of the custody and relocation factors attached, it is in the best interest of the child to remain in the primary custody of Mother and for Mother to be able to relocate with the child. Mother has always been the primary caretaker of the child. Both parties have ties to/in Puerto Rico. The parties met in Puerto Rico and lived there for a time before

- 14 -

> moving to Pennsylvania for Father's employment. Mother is not requesting to move in order to keep the child from Father. Relocation will enhance Mother's quality of life emotionally and financially. As Mother is and has been the primary caretaker of the child, said benefits will also benefit the child. Father's relationship with the child will be preserved through regular electronic contact and periods of partial physical custody on breaks from school and over the summer.

Trial Court Order, 8/19/21, unnumbered at 2. The trial court attached to the order the enumerated custody and relocation factors and expressly stated that it considered the attached factors in its analysis. *Id*. unnumbered at 2, 3-4.

While this abbreviated analysis did not cite the specific statutory sections, it highlighted the assessment of the factors that most impacted its decision to permit Mother to move to Puerto Rico and to modify the parties' custody arrangement. Father laments the brevity of the court's analysis, but he fails to convince us that a remand is warranted or that he forfeited any issue on appeal based upon the asserted error by the court. Thus, his first issue fails. *Accord M.J.M., supra*, at 337 (determining the trial court "adequately addressed" the statutory factors in its initial analysis and "merely expanded upon its findings" in its Pa.R.A.P. 1925(a) opinion).

Father's second issue broadly addresses whether the trial court erred in permitting Mother to relocate with J.N.A. to Puerto Rico and disrupting their current custody arrangement. Father dissects the trial court's analysis factor-by-factor, arguing, in essence, that Mother's proposed move is a selfish and ill-advised endeavor to take a job with speculative income in a crime-ridden area with inferior education and to live in a smaller house, all in an unfair

attempt to keep J.N.A. away from him and her paternal family. **See** Father's brief at 16-33. However, this argument did not sway the trial court, and is contrary to the court's factual findings, which are grounded in the record.

As this Court has commented, "[a] court should avoid dissociating the issue of primary custody from the issue of relocation, and should instead decide the two issues together under a single umbrella of best interests of the children." **S.S. v. K.F.**, 189 A.3d 1093, 1098 (Pa.Super. 2018) (citations and quotation marks omitted). This is particularly apt in this case, as Mother testified she was "going to have to" move to Puerto Rico without J.N.A. if the court did not grant her relocation petition. N.T., 7/29/21, at 63. Therefore, the trial court was in the difficult position of having to decide whether to separate J.N.A. from one parent for long durations and confront the potential effects of changing her environment.

With respect to the relocation factors, the court found that § 5337(h)(6) and (8) favored relocation, and the remaining factors were either neutral or inapplicable. With respect to the custody factors, the court weighed § 5328(a)(1), (2), (3), (4), (6), (9), (13), and (16) in Mother's favor. The remaining factors were either neutral or inapplicable. That the court weighed most of the custody factors in Mother's favor and found most of the relocation factors to be neutral suggests that after reviewing all of the factors, the trial court determined that upsetting J.N.A.'s status quo in terms of location is less

disruptive than disturbing the status quo in terms of maintaining Mother as the primary caregiver.

Father rejects the trial court's rationale and repeatedly tries to paint Mother as a selfish parent.[5]   However, it is apparent from the court's best-interests analysis that it found Mother's explanation for wanting to move back to Puerto Rico to be sincere.  *See* Trial Court Opinion, 10/27/21, at 1, 6-8 Moreover, the court was persuaded that the relocation would enhance Mother's quality of life.  *Id*.  As Mother testified during the hearing, she moved to Pennsylvania so that Father could pursue better employment opportunities than he had in Puerto Rico, and Mother hoped that she and her daughters could thrive here.  In her words, "it didn't happen that way."  N.T., 7/29/21, at 48.  Instead, according to her testimony, Mother found herself a plane ride away from her family, financially dependent on Father, and isolated from the community.  *Id*. at 11, 14.

Unsurprisingly, Father denied subjecting Mother to abuse, but even he admitted he wanted to prioritize his work and did not support Mother's

---

[5] For example, in attempting to undermine the trial court's conclusion regarding custody factor nine, that Mother is the parent most equipped to maintain a loving, stable, consistent and nurturing relationship adequate for J.N.A.'s emotional needs, Father insinuates that Mother could not possibly care about J.N.A. because she "was more than willing to relocate to Puerto Rico without her daughter."  Father's brief at 24.  Father's exaggeration of Mother's testimony and his repeated attempts to paint Mother as an uncaring parent did not sway the trial court and it certainly does not convince us that the trial court abused its discretion.

employment. *Id*. at 161. The certified record bears out that Mother obtained a temporary PFA order against Father. Furthermore, Mother indicated that, even if she can find childcare in Pennsylvania, something that she described as challenging, she has no one to rely on in an emergency. In Puerto Rico, however, she has housing, support of her family, childcare, and employment. As the certified record supports that trial court's factual findings and assessment of credibility relating to the sincerity of Mother's motives and the potential enhancements to her life, we defer to the court's determinations. *A.V.*, *supra* at 820.

Father quibbles with the trial court's assessment of the first custody factor, *i.e.*, Mother is more likely to encourage frequent and continuing contact, as well as the court's determination in favor of Mother concerning factor thirteen, *i.e.*, that Mother was more likely to cooperate. Father's brief at 18, 25. However, there is no doubt that the court's findings are supported by the certified record. Perhaps most illustrative of this point is the fact that just three weeks before the hearing, Father knowingly refused a court-ordered custody transfer simply because he felt he was owed the day for some past unspecified transgression. N.T., 7/29/21, at 138.

Similarly, although Father admittedly discouraged Mother from working and relied upon Mother for childcare before and after their separation, Father insists custody factor three, the performance of parental duties, should be equal. Father's brief at 22-23. Once again, the record supports the trial

court's finding. Mother testified at length to the care she has provided for J.N.A. since birth, including feeding her, dressing her, taking her to appointments, church, and her early childhood educational program, and assisting her with virtual school during the pandemic. N.T., 7/29/21, at 17, 20, 23. Mother attends to all of J.N.A.'s medical and dental appointments, compared to Father's infrequent attendance. *Id*. at 17 ("[m]aybe once or twice"). When J.N.A. was one year old, Mother noticed that she was not "speaking as she should." *Id*. at 21. Mother researched options, located a speech therapy program for J.N.A., and ensured that J.N.A. participated. *Id*. at 21-22.

Father, on the other hand, seemed to bolster his participation in caring for J.N.A. For example, he insisted he always attended J.N.A.'s speech therapy when he was not working, but on cross-examination he admitted that when the therapist came to the home, he left the room during the therapy and was in the "man cave that [he] designed." *Id*. at 112-13, 150. Thus, while it is true that Mother will have to balance caring for J.N.A. and working in Puerto Rico, we discern no abuse of discretion in the trial court's determination that Mother has performed most of the parenting of J.N.A. to date and is equipped to continue to do so. *See M.J.M.*, *supra*, at 339 (observing that custody factors three and four address implicitly address the consideration of "which parent spent more time providing day-to-day care for a young child").

Regarding custody factors two and sixteen, Father argues that the trial court erred and abused its discretion in finding that he abused Mother. Father's brief at 19-22.  Father argues even if Mother's allegations were true, the evidence of record is insufficient to constitute abuse as defined by the Child Custody Act.  *Id*. (citing 23 Pa.C.S. § 5322(a) (incorporating definition of abuse set forth in the Protection from Abuse Act, 23 Pa.C.S. § 6102)).[6]

_____

[6] The relevant portion of the Protection from Abuse Act provides as follows.

"Abuse." The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any

*(Footnote Continued Next Page)*

The trial court's specific finding under factor two was that "Mother testified she is fearful of Father and that Father subjected her to economic abuse, control, and isolation. The [c]ourt finds Mother credible. [J.N.A.] is not in danger." Trial Court Opinion, 10/27/21, at 2. The court referenced similar findings again in its discussion of the catch-all custody factor sixteen, referencing Mother's testimony that Father controlled the money and isolated her from other people, as well as Mother's testimony that she was a victim of abuse by Father. *Id*. at 5. The court also recognized that Mother spent time with Father, J.N.A., and her other daughter as a family while the no-contact order was in effect. *Id*.

Mother did not testify to the specific incidents that prompted her to obtain the temporary PFA order, nor did she elaborate upon the specifics of the abuse that caused her to fear Father.[7] Her testimony focused on financial and psychological control and isolation. *See* N.T., 7/29/21, at 11, 14, 61-63. While this dynamic certainly can be abusive, the noted conduct does not fall

---

criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102.

[7] Mother's original cross-filed custody complaint averred that she obtained the temporary PFA order due to an incident where Father pushed her while he was holding J.N.A. *See* Mother's Complaint for Custody, 10/22/18, at ¶ 7. Mother did not offer testimony regarding this alleged incident at trial, and the PFA court did not make any findings regarding this allegation because the parties resolved Mother's petition through a civil no-contact order without any admissions of abuse.

within the statutory definition of abuse, which we outlined in footnote six of this memorandum.

Nevertheless, particularly given that factor sixteen, "[a]ny other relevant factor," gives the court wide latitude as part of its quest to "determine the best interest of the child by considering all relevant factors," 23 Pa.C.S. § 5328, Father's argument fails to convince us that the trial court erred or abused its discretion by mentioning Mother's concerns as part of its analysis. Overall, the court did not weigh Mother's testimony as significant in terms of the custodial arrangement, as the court did not mention it in the summary of its rationale in its August 23, 2021 order or the core analysis in its Pa.R.A.P. 1925(a) opinion. **See** Order, 8/23/21, at 1; Trial Court Opinion, 10/27/21, at 1. Furthermore, the trial court explicitly found J.N.A.'s safety was not in danger. Trial Court Opinion, 10/27/21, at 2.

Mother's testimony is mostly relevant to Mother's motive for relocating, insomuch as it highlighted her lack of support system here in Pennsylvania. The dynamics of Mother and Father's relationship, even if not abusive within the meaning of the Child Custody Act, have bearing on their ability to co-parent. Thus, we discern no error or abuse of discretion in the trial court's consideration of Mother's testimony and decline to vacate the order as Father requests.

Father's last set of arguments are geared towards critiquing the move itself. **See** Father's brief at 26-33. He again focuses on Mother's alleged

selfishness, highlighting his view that the move benefits only Mother. He laments that J.N.A. will have to share a bedroom with Mother instead of having her own bedroom at his house. Then, he sets forth rampant speculation that Mother's employment will be unsuccessful because it involves selling on commission. Likewise, despite J.N.A.'s ability to receive speech therapy at the private school proposed by Mother, Father posits that the school could deny therapy to J.N.A., leaving the family without due process rights to protest. Finally, he stresses that the move will disrupt his close relationship with J.N.A., as well as end her frequent contact with paternal family members who visit regularly from a neighboring state.

These arguments ignore that in many cases, the detriment to J.N.A. had a corresponding benefit. For example, leaving Pennsylvania put J.N.A. further away from her paternal family, but enabled her to be closer to her maternal family. Father's most compelling argument is distance; obviously, that contact will require an airplane ride is not ideal and a significant change from seeing Father every weekend. Nevertheless, the trial court considered the distance and provided Father with a long continuous stretch of physical custody each summer as well as school breaks. Recognizing that the current arrangement is no longer an option, and that the alternative would require separating J.N.A. from Mother and her half-sister for most of the year, the trial court chose to prioritize the child's relationships with Mother and her half-sister. We discern no abuse of discretion in this choice.

Essentially, Father's arguments ask this Court to disrupt the trial court's careful balancing of the factors. This we cannot do. **See M.J.M.**, **supra** at 339 ("It is within the trial court's purview as the finder of fact to determine which factors are the most salient and critical in each particular case."). Given that the trial court's findings have ample support in the record, we will not interfere with the court's careful consideration of J.N.A.'s best interests and balancing of all of the custody and relocation factors as a whole. Thus, we affirm the trial court's order granting Mother the ability to relocate with J.N.A. to Puerto Rico and to exercise primary custody of J.N.A.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2022